**William G. MARSHALL, Jr., Plaintiff,**

v.

**Edward PLANZ, et al., Defendants.**

**No. Civ.A. 97–T–793–S.**

United States District Court,
M.D. Alabama,
Southern Division.

July 9, 1998.

Order Modifying Opinion on
Reconsideration in Part
July 22, 1998.

---

Joseph Terrace Carpenter, Nathan C. Prater, Montgomery, AL, Jeffrey S. Jacobovitz, Mark L. Rosenberg, Alan A.B. McDowell, Beth M. Kramer, Michaels, Wishner & Bonner, P.C., Washington, DC, for William G. Marshall, Jr., M.D., plaintiff.

Kerry Phillip Luke, Edward O. Conerly, Hall, Conerly, Mudd & Bolvig, Birmingham, AL, John F. Mandt, Phillip A. Nichols, Balch & Bingham, Birmingham, AL, Michael Baird Beers, Winston Whitehead Edwards, Beers, Anderson, Jacksonn, Hughes & Patty, PC, Montgomery, AL, Joseph C. Espy, III, A. Lester (Les) Hayes, III, Melton, Espy, Williams & Hayes P.C., Montgomery, AL, Paul G. Smith, Matthew C. Williams, Smith, Spires & Peddy, Birmingham, AL, for Edward Planz, M.D., defendant.

Kerry Phillip Luke, Edward O. Conerly, Hall, Conerly, Mudd & Bolvig, Birmingham, AL, John F. Mandt, Phillip A. Nichols, Balch & Bingham, Birmingham, AL, Michael Baird Beers, Winston Whitehead Edwards, Beers, Anderson, Jacksonn, Hughes & Patty, PC, Montgomery, AL, Joseph C. Espy, III, A. Lester (Les) Hayes, III, Melton, Espy, Williams & Hayes P.C., Montgomery, AL, for Southeastern Cardiovascular Associates, P.C., defendant.

## ORDER

MYRON H. THOMPSON, District Judge.

In this lawsuit, plaintiff William G. Marshall, Jr., M.D., asserts state-law defamation claims against defendants Edward Planz, M.D. (his former business partner) and Southeastern Cardiovascular Associates, P.C. ("SCA") (a corporation of which Planz is currently, and Marshall was formerly, a shareholder and employee).[1] Pending before the court is the motion for summary judg-ment filed by the defendants as to Marshall's state-law defamation claims.[2] For the following reasons, the court finds that the defendants' motion is due to be granted in part and denied in part.

## I. MOTION FOR SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities of the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. DISCUSSION

In support of his defamation claims, Marshall points to eight separate categories of allegedly defamatory statements concerning him made by Planz. As gleaned from the complaint and the parties' briefs, these categories are as follows:

---

1. Marshall also asserts claims grounded on §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1 and 2, and § 4 of the Clayton Act, 15 U.S.C.A. § 15, as well as numerous state-law claims, namely tortious interference with business and contractual relations, breach of contract, monopolization, and civil conspiracy. This court has federal-question jurisdiction over this lawsuit pursuant to .28 U.S.C.A. §§ 1331 and 1337, and supplemental jurisdiction over Marshall's state-law claims pursuant to 28 U.S.C.A. § 1367(a).

2. In their motion for summary judgment, the defendants also sought summary judgment on Marshall's federal and state antitrust claims, and on the remainder of Marshall's state-law claims, with the exception of the breach-of-contract claim. By order entered July 8, 1998, the court granted the motion as to all federal and state antitrust claims. This order addresses only the defamation claims.

(1) "In or about the first week of December, 1996, Dr. Marshall became aware that Dr. Planz had openly speculated about the severity of Dr. Marshall's back condition to anesthesiologists at [Southeast Alabama Medical Center (SAMC) ]. Specifically, Dr. Planz had told anesthesiologists that Dr. Marshall had severe back problems that prevented him from operating safely. As a result, anesthesiologists were reluctant to anesthetize Dr. Marshall's patients because they felt he was unfit for surgery." [3]

(2) "In November of 1996, Dr. Planz phoned at least one senior [SAMC] official and made the false statement that Dr. Marshall may be suicidal or 'out of touch with reality,' without any basis in fact." [4]

(3) Planz told an outside reviewer from the American Medico–Legal Foundation that Marshall had been suspended from his medical residency program for six months, when in fact he had only been suspended for a week.[5]

(4) "Dr. Planz accused Dr. Marshall of abandoning his patients by going to a continuing education seminar . . . even though Dr. Marshall and Dr. Planz had previously agreed to take care of each other's patients when either doctor was out of town." [6]

(5) "Dr. Planz remarked in the intensive care unit that 'Dr. Marshall killed another one.' Dr. Planz in a discussion with another surgeon invited the surgeon to assist in his operating room 'where we don't kill people.' " [7]

(6) "Dr. Planz had called the Cardiovascular Surgery Intensive Care Unit during the evening of January 3 or early morning of January 4 [1997] and stated that Dr. Marshall's surgical privileges had been terminated, not suspended. Dr. Planz had ordered the staff to disregard any orders or instructions about patient care from Dr. Marshall, despite the fact that Dr. Marshall was still entitled to make rounds." [8]

(7) "Dr. Planz had told patients and others that Dr. Marshall no longer practiced medicine in Dothan and has moved from the city—when, in fact, at that time, Dr. Marshall had not left Dothan and hoped to continue to practice there." [9]

(8) "In or about the last week of December [1996], Dr. Planz . . . made an unfounded quality of care complaint to [SAMC's Executive and Credentials Committee (E & C Committee) ] criticizing and questioning Dr. Marshall's treatment of two patients." [10]

Because the allegedly defamatory statements in the first, second, and third categories described above raise common legal issues at the summary judgment stage, the court will address these categories collectively. Next, it will turn to the statements in categories four, five, six, and seven, which also raise common issues. Finally, the court will address the statements in category eight. For the following reasons, the court will grant the defendants' motion as to the claims based upon categories four, five, six, seven, and eight, but not as to those based upon categories one, two, and three.

### A. Statements in Categories One, Two, and Three

The statements associated with the first category described above were allegedly made by Planz to Dr. James York, an anesthesiologist who was scheduled at the time the statement was made to put Marshall's patients to sleep, Dr. Wayne Hannah, who was SAMC's medical staff director at the time, and Dr. Richard Davis, a physician from the American Medico–Legal Foundation who assisted in the review of SAMC's cardiovascular surgery department. Planz

---

3. Pl.'s second amended compl., filed on Oct. 23, 1997, at ¶ 24.

4. *Id.* at ¶ 27.

5. Marshall dep. at 149, 152, pl.'s exhibit no. 17.

6. Pl.'s second amended compl., filed on Oct. 23, 1997, at ¶ 13.

7. *Id.* at ¶ 26.

8. *Id.* at ¶ 30 (emphasis in original).

9. *Id.* at ¶ 33.

10. *Id.*

allegedly told York, after the latter had inquired into whether Marshall's health would impair his ability to perform surgery, that Marshall was having pain in his back and numbness in his hands as a result of his cervical neck disease, despite his having recently undergone back surgery. Based upon Planz's statements, York informed Dr. Ralph Fillmore, another anesthesiologist, of his concerns regarding Marshall's ability to perform surgery, and the latter subsequently told Dr. George Veale, the chair of SAMC's Quality Committee, that questions had been raised as to whether Marshall was fit to perform cardiac surgery. This flurry of activity, which took place over the Thanksgiving weekend of 1996 and included additional conversations between SAMC-affiliated physicians concerning Marshall's health, ultimately led Marshall to refrain voluntarily from performing operations scheduled for the following Monday. The record also indicates that Planz related this incident to Hannah on that Monday.

Additionally, the report prepared for the American Medico–Legal Foundation by Davis indicates that Planz told Davis during the course of his review of SAMC's cardiovascular surgery department that Marshall "has significant physical impairment from his cervical disk disease and frequently has severe pain." [11]

The statements associated with the second category discussed above, that Marshall suffered from a personality disorder and was suicidal, were also allegedly made by Planz to an outside reviewer and other physicians at SAMC. Specifically, Davis's report for the American Medico–Legal Foundation shows that Planz informed him that Marshall had a "significant personality disorder," as evidenced by his frequent change in jobs.[12] Planz also told Hannah that Marshall harbored suicidal thoughts after he was allegedly told by SCA employees that Planz had made statements that suggested a suicidal state of mind.

Finally, the statement in the third category described above was allegedly made by Planz to Davis during the course of the American Medico–Legal Foundation review.

Davis's report states that Planz "cited a forced 6 month sabbatical·from residency and implied it was do [sic] to some behavioral problem" in support of his observation that Marshall suffered from a "significant personality disorder." [13]

 With the sole exception of the statements in category three, as discussed more fully below, the defendants do not dispute that all of the foregoing statements are capable of a defamatory meaning. Instead, the defendants argue that none of these statements gives rise to a viable defamation claim because they are all subject to a qualified privilege under Alabama law, pursuant to which actual, or common-law, malice must be shown to establish liability. The qualified privilege upon which the defendants stake their defense has been described by the Alabama Supreme Court as follows:

> " 'Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. . . . The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.' "

*Fulton v. Advertiser Co.*, 388 So.2d 533, 537 (Ala.1980) (quoting *Willis v. Demopolis Nursing Home, Inc.*, 336 So.2d 1117 (Ala. 1976)). According to the Alabama Supreme Court, the question of whether a challenged statement is subject to this privilege is one of law for the court. *Id.*

 Once the court finds that the qualified privilege applies, however, the inquiry shifts to whether " 'the communication was made with actual or common law malice (shown by evidence of previous ill will, hostility, threats,

---

11. Report of American Medico–Legal Foundation, at 12, pl.'s exhibit no. 19.

12. *Id.*

13. *Id.*

other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of the publication, and the like).'" *Cousins v. T.G. & Y. Stores Co.*, 514 So.2d 904, 906 (Ala.1987) (quoting *Wilson v. Birmingham Post Co.*, 482 So.2d 1209 (Ala. 1986)) (citations omitted).[14] This determination of whether actual malice is present is an intensely factual one, as the Alabama Supreme Court emphasized in *Fulton* when it observed that the actual-malice issue "seems particularly inappropriate for disposition by summary judgment because it concerns 'motive, intent, and subjective feelings and reactions.'" *Fulton*, 388 So.2d at 539. The plaintiff bears the burden of proving that the defendant acted with actual malice. *See Atkins Ford Sales, Inc. v. Royster*, 560 So.2d 197, 200 (Ala.1990).

■ The defendants contend that all of the statements in the first, second, and third categories fall squarely within the qualified privilege described above because Planz acted pursuant to his social or moral duty as a physician when he made the challenged statements in an effort to inform other physicians that Marshall's mental and physical health may present a risk to his patients. In pressing this argument, the defendants emphasize that the *Fulton* court did not confine the qualified privilege to situations in which the pertinent duty possesses the force of legal obligation; instead, the court explained that the duty is sufficient to give rise to the qualified privilege "if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken." *Fulton*, 388 So.2d at 537. This requirement is satisfied here, the defendants maintain, because Planz "was prompted to make the statements to the proper authorities under a social, moral and ethical duty to protect the patients, the hospital and his practice of cardiovascular surgery."[15]

The court agrees that the statements in categories one, two, and three were subject to the qualified privilege. The public un-doubtedly has a general interest in the maintenance of patient safety at SAMC, and the physicians at the hospital share an ethical duty to take appropriate steps to ensure that their colleagues are mentally and physically fit to carry out their medical responsibilities. Moreover, the challenged statements were directed exclusively to Planz's physician colleagues at SAMC, both those who worked directly with Marshall and those who occupied administrative positions at the hospital, or to an outside reviewer who was charged with evaluating the hospital's cardiovascular surgery program and Marshall's performance. Thus, they plainly constituted communications made between individuals having a common interest, and so fall within the scope of the qualified privilege.

■ Having found that Planz's statements in categories one, two, and three are subject to the qualified privilege, the court must next ascertain whether Marshall has proffered sufficient evidence to support a reasonable inference that the statements were made with actual or common-law malice, and therefore are actionable despite the privilege. Absent such a showing, the court will conclude that Marshall has failed to create a genuine issue of material fact as to whether Planz's statements were motivated by actual malice, and summary judgment for the defendants would be appropriate.

■ The court finds that Marshall survives summary judgment as to the statements in categories one, two, and three because the fact-finder could reasonably conclude from the record that they were animated by actual malice. Neither party could reasonably dispute that at the time the challenged statements were made relations between Planz and Marshall were rapidly approaching their nadir, and an atmosphere of open hostility and ill will had developed between the former partners, who had become rivals. *See Fulton*, 388 So.2d at 537 (evidence of previous ill will, hostility, and rivalry supports a finding of actual or common-law malice). Moreover,

---

14. This is true where, as both parties recognize to be true here, the challenged communication concerns a private person, as opposed to a public official or figure. *See Fulton*, 388 So.2d at 538.

15. Defs.' brief in support of motion for summary judgment regarding defamation count, filed on March 13, 1998, at 57.

the fact-finder could credit Marshall's evidence suggesting that Planz made the challenged statements and lodged his quality-of-care complaint without determining whether they were truthful or not, which provides further support for a finding that Planz acted with malice.[16] In view of this evidence, and consistent with the Alabama Supreme Court's admonition that summary judgment is a "peculiarly inappropriate" means for disposing of the issue of actual malice, the court finds that the defendants have failed to meet their burden of demonstrating the absence of a genuine issue of material fact regarding actual malice, and their motion should be denied as to the statements in the first, second, and third categories described above.[17]

■■■■■ The court notes that the defendants also contend that the statements in the first category, concerning Marshall's back problems, are not defamatory because they are true. Truth, of course, is "a complete and absolute defense" to claims of defamation. *Battles v. Ford Motor Credit Co.*, 597 So.2d 688, 692 (Ala.1992). However, Marshall contends that none of the statements in category one is true. Marshall points to two letters, one dated within a week of when Planz made the challenged statements, in which Marshall's personal physician, Dr. Evan Zeiger, stated that though Marshall had suffered from some numbness and tingling in his hands, he never suffered from any impairment that would prevent him from performing surgery successfully.[18] Based

upon this evidence, the court finds that the defendants have failed to satisfy their burden of establishing the absence of a genuine issue of material fact regarding the falsity of the category one statements, and therefore they cannot prevail at the summary judgment stage on their truth defense.

Before turning to the next categories of allegedly defamatory statements, the court must address two final arguments raised by the defendants concerning the statements in category three. Specifically, the defendants maintain that there is no evidence that the statement that Marshall was suspended from his residency program for six months was ever actually published, and that in any event this statement was not defamatory because Davis, the outside reviewer, had been made aware of the fact that Planz and Marshall were not on amicable terms when Planz made the challenged statements, and because none of the reports prepared by the American Medico–Legal Foundation indicated that the reviewers relied upon the statements in recommending that Marshall undertake additional training.

■■■■■ Neither of these arguments is well founded. Marshall has satisfied his burden concerning publication by showing that Davis, in his report on Marshall and SAMC's cardiovascular surgery program, indicates that "Dr. Planz cited a forced 6 month sabbatical from residency and implied it was do [sic] to some behavioral problem." This entry is sufficient to raise a question of fact

---

**16.** The court recognizes that Marshall need not satisfy the more stringent 'constitutional actual malice' standard here, which demands a showing that the defendant made the challenged statement "with knowledge that it ... was false or with reckless disregard of whether it was false or not," because he is not a public figure or official. *See Fulton*, 388 So.2d at 537. However, evidence that the defendant failed to determine whether or not his or her statements were grounded in fact is probative of whether common-law malice motivated the statements, since disregard of the truth may suggest that ill will and hostility were actually at work.

**17.** The court recognizes that certain indicia of actual malice may be absent from the record in this case. Specifically, there is little in the record to suggest that the "violence" of Planz's language or "the mode and extent of publication," at least as to categories one, two, and

three, support a conclusion that Planz acted with actual malice. Nonetheless, the hostility and rivalry between Planz and Marshall, as well as the evidence that Planz did not fully investigate the veracity of his statements, provide a sufficient basis for denying summary judgment as to the statements in categories one, two, and three.

**18.** *See* letter from H. Evan Zeiger, M.D., to Joseph F. Smith, M.D., dated Dec. 2, 1996, pl.'s exhibit no. 7; letter by H. Evan Zeiger, M.D., dated March 3, 1998, pl.'s exhibit no. 8. Marshall also points to the deposition testimony of Dr. Ross Clifton, who doubted that Marshall's back problems ever impaired his ability to perform surgery, and Dr. Steven Johnson, who stated that he never witnessed Marshall having any health problems during the approximately 22 operations in which he assisted Marshall. *See* Clifton dep. at 49, 82, pl.'s exhibit no. 3; Johnson dep. at 51, pl.'s exhibit no. 11.

regarding whether Planz actually published the allegedly defamatory statement. Additionally, the court is puzzled by the defendants' assertion that the statement cannot be considered defamatory because Davis was cognizant of the strained relations between Planz and Marshall and because the American Medico–Legal Foundation did not rely upon the statement in reaching its conclusions. A statement is considered defamatory " 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Harris v. School Annual Publishing Co.*, 466 So.2d 963, 964 (Ala.1985) (quoting Restatement (Second) of Torts § 559 (1976)). Under this definition, there is no question that a false claim that a physician was suspended for a six-month period during his residency is capable of possessing defamatory meaning. That the recipient of the communication may have had reason to believe that it was motivated by ill will or a rivalry does nothing to mitigate its defamatory sting. Moreover, the question of whether or not the allegedly defamatory statement actually provoked a response adverse to Marshall goes not to whether the statement defamed Marshall; instead, this question would be pertinent, if at all, to the determination of the damages Marshall sustained as a consequence of Planz's defamatory utterance.

### B. Statements in Categories Four, Five, Six, and Seven

The allegedly defamatory statements in categories four, five, six, and seven raise issues different from those just discussed. The circumstances surrounding these statements are as follows.

Regarding category four, Marshall alleges that Planz, at a meeting attended by Fred Pelle, SAMC's chief executive officer, and Dr. Ralph Fillmore, accused Marshall of abandoning a patient to attend an out-of-town continuing-education seminar. As evidence that the alleged statement was made, Marshall points to his own deposition testimony, in which he states that Pelle informed him of the statement and the circumstances under which it was made. Marshall also cites the deposition testimony of Dr. Wayne Hannah to establish that the challenged statement was published.[19] Planz counters by denying that he ever made the accusation, and by pointing out that nothing in Pelle's deposition in this case supports Marshall's claim because the subject was never broached during the deposition.

Marshall bases his defamation claim regarding the fifth category of statements on his own deposition testimony that he had been told by nurses at SAMC that Planz had stated that Marshall had "killed another one," referring to a patient, and that Pelle had informed Marshall that he had heard from nurses that Planz had asked Dr. Steven Johnson, an SCA surgeon, to work in Planz's operating room, where "we don't kill patients." [20] Marshall also refers to Pelle's deposition testimony that one of the "directors of nursing had mentioned that Dr..Planz had walked into one of the units that she's responsible for" and said that Marshall "killed another one." [21]

Planz denies having ever made these statements, and cites Johnson's deposition testimony, in which he stated that he did not recall Planz having told him that Marshall was killing his patients. The defendants also counter Marshall's allegations by proffering the affidavit of the nurse from whom Pelle testified he had learned about Planz's alleged statement regarding the 'killing' of patients,

**19.** The pertinent portion of Hannah's deposition reads as follows:

"Question: Did Planz ever tell you that Dr. Marshall had abandoned his patients?

"Answer: No. I don't recall that, no.

"Question: Did you ever hear of anybody telling you Dr. Planz told them that Marshall had abandoned his patients?

"Answer: You know, I have—when you ask that question, I have—it reminds that I heard at some point that there was some talk that Bill [Marshall] had left town and there was a sick patient who was on some sort of device, and I have no idea what that device was. That's something I don't know about. But to tell you who told me that, I don't know. It might of been from the nurses. I don't know."

Hannah dep. at 38–39, pl.'s exhibit no. 9.

**20.** Marshall dep. at 154, 168–72, pl.'s exhibit no. 17.

**21.** Pelle dep. at 54, 87–88, pl.'s exhibit no. 14.

in which she denies having ever heard such statements or having reported them to Pelle.

In support of his claim based upon the sixth category of allegedly defamatory statements, Marshall proffers his own deposition testimony in which he stated that Planz called nurses in SAMC's cardiovascular surgery intensive care unit (CVICU) after the suspension of Marshall's surgical privileges in early January 1997, and informed them that Marshall's privileges had been terminated, and that his orders and instructions were to be disregarded. It is not disputed that at the time Marshall's privileges had been merely suspended, not terminated, and he was still entitled to make his rounds and treat his patients. In his deposition testimony, Marshall stated that he had been informed by a member or members of the nursing staff that Planz had made the alleged phone calls.[22] In addition, Marshall offers a memorandum prepared by a nursing supervisor in SAMC's CVICU, and a transcript of a taped conversation between that nurse and Marshall concerning the confusion among nursing staff regarding Marshall's status and whether his orders were to be followed. Neither the memorandum nor transcript make any mention of Marshall's privileges having been 'terminated;' instead, each refers only to the 'suspension' of the privileges. Planz denies having made the alleged phone calls.

The only evidence that Marshall points to in support of his claim based upon the seventh category of allegedly defamatory statements is his own deposition testimony, in which he stated that "various and sundry people" had told him that Planz had falsely informed patients and patients' families that Marshall had left Dothan, when in fact he had not.[23] Marshall stated that he could not specifically recall who had provided him with this information.[24]

As to all of the statements in categories four, five, six, and seven, the defendants contend that Marshall has failed to muster sufficient evidence to survive summary judgment on the so-called 'publication' element of a defamation claim. See Walton v. Bromberg & Co., Inc., 514 So.2d 1010, 1011 (Ala.1987) ("One of the elements of a plaintiff's prima facie defamation case is publication of the allegedly defamatory matter. The burden of proving publication is usually satisfied when the plaintiff shows publication of the defamatory matter to someone other than himself.") (citations omitted). Specifically, regarding categories four, five, and six, the defendants contend that Marshall's asserted evidentiary basis consists exclusively of inadmissible hearsay statements and conclusory allegations in Marshall's own deposition. Regarding category seven, the defendants maintain that Marshall has failed to meet his evidentiary burden because he can offer only his own testimony concerning statements made by unidentified individuals.

The court agrees with the defendants that Marshall relies exclusively on hearsay evidence in attempting to establish that all of the alleged statements in categories four, five, six, and seven were actually published. In no instance has Marshall proffered the deposition or affidavit testimony of the person who is purported to have heard Planz make the statements; instead, he offers testimony of individuals (including himself) who claim to have heard about the challenged statements from the person who originally heard them. Moreover, in one instance the person who purportedly heard Planz make a disputed remark has denied in an affidavit having ever heard it or having passed along information regarding it.

To survive summary judgment on the publication issue, Marshall may not rely upon deposition testimony that constitutes inadmissible hearsay, at least where that hearsay will not be reducible to admissible form at trial. See Pritchard v. Southern Co. Services, 92 F.3d 1130, 1135 (11th Cir. 1996); McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir.1996); Bush v. Barnett Bank of Pinellas County, 916 F.Supp. 1244, 1256 (M.D.Fla.1996) (affidavit testimony, by person who was told about challenged statement by another person who purportedly heard it, was introduced to prove that statement had

---

22. Marshall dep. at 253–57, pl.'s exhibit no. 17.

23. *Id.* at 445–46.

24. *Id.*

been published and was therefore a "classic example of hearsay" that may not be used to oppose summary judgment; plaintiff presented no testimony by the person who purportedly heard the challenged statement). An example of hearsay evidence that may be used to defeat summary judgment is a statement in a sworn affidavit that may be translated into testimony once trial has commenced. *See Pritchard,* 92 F.3d at 1135.

Here, as stated, Marshall has not presented any non-hearsay evidence in support of his assertion that the statements in categories four, five, six, and seven were actually published, nor is there any indication that the hearsay evidence he does rely upon would be reducible to admissible form at trial. As to category four, Marshall relies upon his own deposition testimony that Pelle told him that Pelle had heard Planz make the patient-abandonment accusation; he does not proffer any testimony by Pelle himself that the statements was published. *See Bush,* 916 F.Supp. at 1256 (plaintiff proffers "pure hearsay," and thus cannot defeat summary judgment on publication issue, where she presents no affidavit or deposition from the person who purportedly heard defamatory statement, but only another person's quotation of that person). Marshall also points to the deposition testimony of Dr. Wayne Hannah, as described above, but this testimony, apart from the fact that it constitutes inadmissable hearsay, is far too vague and indefinite to provide any evidentiary support for Marshall's claim that the patient-abandonment accusation was actually made.

Likewise, as to category five, Marshall relies exclusively on inadmissible hearsay evidence that shows no signs of being reducible to admissible trial evidence. Specifically, Marshall cites his own deposition testimony, which consists exclusively of hearsay statements concerning what Pelle and "nurses" at SAMC had told him about what Planz had said. He also refers to Pelle's deposition testimony, but, once again, this evidence contains only statements regarding what a nursing director had told Pelle about what Planz had allegedly said. In fact, the defendants have proffered an affidavit by that nursing director, which is indeed hearsay evidence reducible to admissible form (i.e., the nursing director could testify at trial), *see Pritchard,*

92 F.3d at 1135, in which she denies both having heard and having reported to Pelle the statement attributed to Planz. Thus, Marshall has attempted to defeat summary judgment as to category five exclusively by use of inadmissable hearsay evidence.

As to category six, Marshall once again relies upon his own deposition testimony regarding what a person or persons (SAMC nurses) told him about what Planz had allegedly said, and fails to present the depositions or affidavit testimony of those persons. While Marshall does attempt to further support his claim by reference to the memorandum prepared by Gayle Hart, a nursing supervisor at SAMC, and a transcript of a tape-recorded conversation between Marshall and Hart, these materials, as stated, are devoid of any mention of the 'termination' of Marshall's privileges, and so actually support Planz's denial that he used that term in discussions with the CVICU nursing staff.

The deficiency of Marshall's attempt to stave off summary judgment as to category seven is even more pronounced. Here, he offers only his own deposition testimony regarding what he heard from "various and sundry" unidentified individuals in Dothan. This evidence, which both constitutes hearsay and is incredibly vague and indefinite, is manifestly inadequate to defeat the defendants' motion for summary judgment.

Accordingly, Marshall has failed to establish the existence of a genuine issue of material fact concerning whether the challenged statements in categories four, five, six, and seven were ever published, because he has presented no competent evidence on this essential element of his defamation claim. Therefore, the defendants motion for summary judgment is due to be granted as to these categories of allegedly defamatory statements.

### C. Statements in Category Eight

The eighth category of allegedly defamatory statements described above revolves around Planz's filing of an assertedly 'unfounded' quality-of-care complaint regarding Marshall's treatment of patients with Dr. Wayne Hannah, who subsequently passed it along to SAMC's E & C Committee. According to Hannah's deposition testimony,

Planz, accompanied by Dr. Ross Clifton, met with Hannah and expressed his concerns about "Dr. Marshall's judgment, that there had been an incident with an extubation of a patient in the [cardiovascular surgery intensive care unit] that morning that he thought didn't display good judgment."[25] Additionally, Planz informed Hannah that he was concerned that two of Marshall's patients had suffered post-operative strokes.[26] The undisputed record shows that as a consequence of Planz's complaint Hannah contacted the members of the hospital's E & C Committee, who eventually decided to suspend summarily Marshall's surgical privileges pending further investigation.

To address whether or not summary judgment should be granted as to this category of statements, the court must examine in more detail what Planz is alleged to have said when he brought his quality-of-care complaint. Upon review of the record, the court understands Marshall to challenge two specific statements associated with the complaint: (1) that Marshall did not exhibit good medical judgment during the extubation of his patient; and (2) that two of Marshall's patients had suffered strokes as a result of his failure to exercise good medical judgment. As explained below, the court concludes that neither statement gives rise to a viable claim for defamation because they both constitute statements of opinion and do not contain or imply the existence of verifiable facts.

■ Although the Alabama courts have not examined the question of whether statements of opinion are capable of defamatory meaning, other courts subscribe to the principles found in § 566 of the Restatement (Second) of Torts, which provides as follows: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defam-

atory facts as the basis for the opinion." *See Levinsky's v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 127 (1st Cir.1997); *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993); *Swengler v. ITT Corp. Electro–Optical Products Div.,* 993 F.2d 1063, 1071 (4th Cir.1993).[27] In applying these principles, courts inquire into whether or not the challenged statements themselves contain objectively verifiable facts or imply the existence of verifiable facts; under either circumstance, the statements are capable of a defamatory meaning. Where, by contrast, no such verifiable facts are presented or implied by the expression of opinion, a defamation claim is without support. As one court has explained, "A statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes,* 8 F.3d at 1227.

■ Here, the two challenged statements in category eight constitute expressions of opinion that do not contain objectively verifiable facts nor imply that Planz based his opinion on such facts. To be sure, the two statements do indeed refer to the existence of objectively verifiable facts, namely the incident concerning the extubation and the strokes suffered by two of Marshall's patients. However, the parties do not dispute that these events actually took place, and the truth or falsity of these aspects of the two statements are not the focus of the defamation claims; instead, Marshall challenges as defamatory Planz's speculation or conjecture that the extubation incident and strokes resulted from, and provided evidence of, Marshall's poor medical judgment.

---

25. Hannah Dep. at 28–30, defs.' exhibit no. 7.

26. *Id.*

27. While the principles embodied in § 566 find their most frequent application where the challenged statement addresses a matter of public, rather than private, concern, *see, e.g., Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–19, 110 S.Ct. 2695, 2705–06, 111 L.Ed.2d 1 (1990), there

is no reason to believe that the principles are not equally applicable where a private concern is at issue. *See Levinsky's,* 127 F.3d at 127 n. 2 (noting that § 566 appears to apply to both issues of public and private concerns, which is consistent with Maine's defamation law); *see also Woodward v. Weiss,* 932 F.Supp. 723 (D.S.C.1996) (applying § 566 in the context of a physician's evaluation of a second physician's treatment of patients).

The two challenged statements do not present or imply any objectively verifiable facts. Rather, they express Planz's subjective opinion concerning the quality of care with which Marshall treated his patients. Of course, the validity of Planz's opinion, like virtually all judgments regarding the adequacy of a physician's treatment of his or her patients, may be debatable among medical experts. However, this quality of the challenged statements highlights their inherently subjective nature, confirming that Planz's opinion is not capable of being verified as true or false, and that it presents or implies no truly objectively verifiable facts that would infuse it with defamatory content.

This conclusion is consistent with those reached by other courts that have examined whether physicians' professional assessments of their colleagues' or subordinates' performance are properly subject to defamation actions. For instance, in *Woodward v. Weiss*, 932 F.Supp. 723 (D.S.C.1996), the district court held that a report prepared by a physician critiquing the medical treatment provided by a second physician was not actionable for defamation because the challenged statements in the report constituted opinions only, and did not present any objectively verifiable facts. In the challenged report, the defendant had stated, among other opinions, that the second physician had provided excessive and imprudent treatment to his patients, and that recovery would have been expedited had the recommended course of treatment been followed. *Id.* at 726. The district court concluded that these statements were not susceptible to a defamatory reading because they are debatable among practitioners of medicine and thus not objectively verifiable. *Id.* As the court aptly observed,

> "There is no standard which could be used to render an objective, verifiable, factual answer to these questions. Medicine, with all its great accomplishments, remains an inexact science.... Treatment considered appropriate by one doctor may be considered excessive by another doctor."

*Id.* See *Baldwin v. University of Texas*, 945 F.Supp. 1022 (S.D.Tex.1996) (holding that statements in evaluations and quarterly performance reviews completed by medical faculty concerning the residents under their supervision are not defamatory as a matter of law, because they reflect only the faculty's own opinions based upon their observation of the residents' performance).

Thus, the court concludes that the statements in category eight, relating to the allegedly unfounded quality-of-care complaint brought against Marshall by Planz, are not, as a matter of law, capable of a defamatory meaning because they constitute a pure expression of opinion and do not present or imply objectively verifiable facts. Consequently, the defendants' motion for summary judgment is due to be granted as to the category eight statements.

## III. CONCLUSION

Because the court finds that Marshall has raised a genuine issue of material fact regarding whether the allegedly defamatory statements in categories one, two, and three described above were motivated by actual malice, the court will deny the defendants' motion for summary judgment as to those claims. The court will grant the motion as to the challenged statements in categories four, five, six, and seven, however, because Marshall has failed to raise a genuine issue of material fact as to the publication element of his defamation claims. Finally, the court will grant the defendants' motion as to the statements in category eight, because they are non-actionable opinions that neither present nor imply objectively verifiable facts.

Accordingly, it is ORDERED that the motion for summary judgment, filed by defendants Edward Planz, M.D., and Southeastern Cardiovascular Associates, P.C. on March 18, 1998, is granted in part and denied in part as follows:

(1) Is granted as to the following aspects of plaintiff William G. Marshall, Jr.'s third cause of action, alleging defamation under Alabama law: (a) that defendant Planz accused plaintiff Marshall of abandoning his patients to attend an out-of-town seminar; (b) that defendant Planz made statements about plaintiff Marshall having "killed" patients; (c) that defendant Planz told nurses at Southeastern Alabama Medical Center that plaintiff Marshall's surgical privileges had been terminated; (d) that defendant

Planz told individuals in Dothan that plaintiff Marshall had moved away from Dothan and no longer practiced medicine there; and (e) that defendant Planz made an 'unfounded' quality-of-care complaint concerning plaintiff Marshall.

(2) Is denied as to the following aspects of plaintiff Marshall's third cause of action, alleging defamation under Alabama law: (a) that defendant Planz openly speculated about the severity of plaintiff Marshall's back problems; (b) that defendant Planz made false statements regarding plaintiff Marshall's mental condition; and (c) that defendant Planz told an outside medical reviewer that plaintiff Marshall had been suspended from his residency program for six months.

## ORDER MODIFYING OPINION ON RECONSIDERATION IN PART

This action is now before the court on the motion for reconsideration filed by plaintiff William G. Marshall, Jr. on July 17, 1998 (Doc. no. 167). In this motion, Marshall asks the court to reconsider its order entered July 9, 1998, granting partial summary judgment in favor of defendants Edward Planz and Southeastern Cardiovascular Associates, P.C., as to Marshall's defamation claims brought under state law.[1] For the reasons provided below, the court will grant the motion for reconsideration in part.

In this motion for reconsideration, Marshall urges the court to reconsider its holding that certain statements Planz allegedly made in connection with a quality-of-care complaint he lodged against Marshall were incapable of defamatory meaning because they neither contained nor implied objectively verifiable facts. Marshall is correct to observe that the defendants did not raise this defense to Marshall's defamation claim in their briefs in support of their motion for summary judgment, and that as a consequence Marshall did not address the issue in his opposition brief. Marshall has now availed himself of the opportunity to further describe the statements made in connection with Planz's lodging of the quality-of-care complaint that he challenges as defamatory, and the court agrees, for the following reasons, with Marshall that summary judgment should be denied as to certain statements associated with the complaint.

As it explained in the defamation order, the court understood Marshall's defamation claim based upon the quality-of-care complaint to: challenge two specific statements: (1) that Marshall did not exhibit good medical judgment during the extubation of his patient; and (2) that two of Marshall's patients had suffered strokes as a result of his failure to exercise good medical judgment. Nothing in Marshall's motion for reconsideration causes the court to question its conclusion that these statements do not present or imply objectively verifiable facts, and so are incapable of defamatory meaning. The court is unpersuaded by the two decisions, *Leyba v. Renger*, 874 F.Supp. 1218, 1221–22 (D.N.M.1994), and *Barakat v. Matz*, 271 Ill. App.3d 662, 208 Ill.Dec. 111, 648 N.E.2d 1033, 1042 (1995), cited by Marshall for the proposition that a statement that a physician does not meet professional standards is capable of defamatory meaning because it is a statement of objectively verifiable fact. Notwithstanding the conclusions reached by these courts, this court stands by its previous holding that the two challenged statements described above represent Planz's highly subjective assessment that Marshall exercised poor medical judgment in his treatment of patients. As such, the challenged statements express "an interpretation, a theory, conjecture, or surmise," and do not imply the existence of facts that may be confirmed or discredited on an objective basis. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir.1993). As the court explained in its defamation order, "the validity of Planz's opinion, like virtually all judgments regarding the adequacy of a physician's treatment of his or her patients, may be debatable among medical experts. However, this quality of the challenged statements highlights their inherently subjective nature, confirming that Planz's opinion is not capable of being verified as true or false, and that it presents or implies no truly objectively verifiable facts that would infuse it with defamatory content."[2]

---

1. *See* order entered July 9, 1998 ("defamation order").

2. Defamation order, at 24.

■ In addition to the foregoing statements, however, Marshall now points to two additional statements that he contends to be defamatory, namely that Marshall "did not have the capacity to voluntarily agree to stop surgery," and that Marshall was "hurting inside about these problems and really wants someone to make him stop." [3] The court agrees with Marshall that Planz implied, in both of these statements, the existence of objectively verifiable facts that would have been harmful to Marshall's reputation. Specifically, the first statement could be understood to imply that Planz was aware of facts indicating that Marshall's mental health was sufficiently impaired that, even when confronted with evidence that his practice of surgery was harming patients, he could not stop practicing absent intervention by his superiors. Similarly, the second statement could be interpreted to demonstrate that Planz was aware of facts indicating that he had suffered mental anguish or other harms as a result of the alleged problems he was having at the hospital, and that he was, in effect, crying out for help. Unlike the two challenged statements originally considered in the defamation order and summarized above, these statements consist of more than Planz's interpretation or assessment of the significance of undisputed facts (i.e., whether or not the extubation procedure performed by Marshall and the strokes suffered by his patients were indicative of a lapse in medical judgment). Instead, these statements actually imply that Planz knew about certain objectively verifiable actions taken or statements made by Marshall suggesting that he was incapable of voluntarily declining to perform surgery even if necessary to protect his patients, or that he was suffering from mental anguish and in need of intervention by his superiors. Consequently, the court agrees with Marshall that these two statements are capable of defamatory meaning.

This conclusion, however, does not end the analysis. Instead, the court must move on to the question of whether these statements are subject to the qualified privilege that the court held in its defamation order to attach to Planz's statements regarding Marshall's

professional conduct made to other physicians at SAMC. As the court explained, this qualified privilege applies " 'Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest,' " but only if the communication is " 'made in good faith and without actual malice.' " *Fulton v. Advertiser Co.,* 388 So.2d 533, 537 (Ala.1980) (quoting *Willis v. Demopolis Nursing Home, Inc.,* 336 So.2d 1117 (Ala.1976)). Moreover, " 'The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.' " *Id.*

■ Because the court finds that the two challenged statements made in connection with Planz's lodging of the quality-of-care complaint were made pursuant to Planz's 'social or moral' duty as a physician to inform other physicians that Marshall's mental and physical health may present a risk to his patients, it concludes that these statements are indeed subject to the qualified privilege. Consequently, the statements are actionable only to the extent that Marshall can show that they were made with common-law, or actual, malice, as the court explained in its defamation order.[4] For the reasons set forth in that order, the court finds that Marshall has raised a genuine issue of fact as to whether Planz's statements were motivated by actual malice, given the hostile relations between Planz and Marshall at the time the quality-of-care complaint was made, and the intensely factual nature of the determination of whether or not actual malice has been shown by the plaintiff.[5]

Accordingly, it is ORDERED that the motion for reconsideration of the order granting partial summary judgment as to the defamation claims, filed by plaintiff William G. Marshall, Jr., on July 17, 1998 (Doc. no. 167), is

---

**3.** Defendant's exhibit no. 10, Wayne Hannah aff.

**4.** *See* defamation order, at 8–9.

**5.** *See* defamation order, at 10–11.

granted to the extent that the court modifies its order, entered July 9, 1998, granting in part and denying in part the motion for summary judgment as to the defamation claims, to reflect the fact that summary judgment is denied as to plaintiff Marshall's allegation that defendant Edward Planz defamed him by making the following statements: (1) that plaintiff Marshall "did not have the capacity to voluntarily agree to stop surgery"; and (2) that plaintiff Marshall was "hurting inside about these problems and really wants someone to make him stop."